# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| BETTY SHERMAN and ANTHONY LOFTON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL MOTORS, LLC,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Betty Sherman and Anthony Lofton (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, submit the following Class Action Complaint against Defendant General Motors, LLC ("GM" or "Defendant"), based upon their personal knowledge as to facts specific to each of them respectively, and based upon the investigation of counsel in all other respects, as follows:

## I.   INTRODUCTION

1.     The most important duty of a motor vehicle manufacturer is to provide consumers with a safe car. Beyond this, the manufacturer of the vehicle has a duty to make and provide a car that functions properly and is free from defects. A related duty of a vehicle manufacturer is to give prompt notice or warning to consumers and fix or replace a car with a defect that implicates a safety issue.

2.     Vehicle manufacturers possess superior knowledge and expertise regarding the cars they manufacture and sell to consumers, who rely upon them to build and sell a safe and reliable motor vehicle.

3.     The Class Vehicles are GM vehicles installed with the L87 6.2L V8 engine ("L87 Engine").  GM claims it is "committed to safety in everything we do"[1] when it markets its vehicles. Despite such basic duties and commitment, GM knowingly sold hundreds of thousands of Class Vehicles, as more fully identified

---

[1]https://www.gm.com/content/dam/company/docs/us/en/gmcom/gmsafetyreport.pdf (last visited June 26, 2025).

below, with defective engines creating a potentially life-threatening risk to their owners, consumers and others.

4. On information and belief, the L87 Engine is found in the following GM vehicles: 2019-2024 Chevrolet Silverado 1500; 2021-2024 Chevrolet Tahoe; 2021-2024 Chevrolet Suburban; 2019-2024 GMC Sierra 1500; 2021-2024 GMC Yukon; 2021-2024 GMC Yukon XL; 2021-2024 Cadillac Escalade; and 2021-2024 Cadillac Escalade ESV.

5. Unknown to the purchasers of the Class Vehicles identified below, their L87 Engines are known to GM be prone to and have experienced failure, resulting in breaching of the engine block by the connecting rod and/or engine seizure (the "Safety Defect" or "Engine Defect"). As a consequence of the Engine Defect, Class Vehicles can experience catastrophic engine failure at any moment, which can cause a loss of power while driving increasing the risk of an accident and even a fatal crash.

6. In late April 2025, GM issued a safety recall for nearly 600,000 vehicles because of the Engine Defect (The "2025 Recall"). In doing so, GM effectively admitted the existence of the defect and that it can result in crashes and injuries. However, despite the 2025 recall, GM failed to address the root causes of the Engine Defect, leaving Plaintiffs and Class Members at continued risk of a catastrophic engine failure. The safety risk arising from the Engine Defect, remains unremedied.

7. Had Plaintiffs and other Class Members been forewarned of the Defect at the time of purchase or lease - which they were not- they would not have bought or leased the Class Vehicles, or would have paid substantially less for them.

8. As a direct and proximate consequence result of Defendant's unfair, deceptive, and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiffs and Class Members, who paid tens of thousands of dollars for their vehicles, have suffered an ascertainable loss of money and/or property in the form of, for example, loss of value, loss of use of their vehicle, and repair costs.

9. Accordingly, Plaintiffs bring this action to obtain equitable relief in the form of a remedy and the issuance of a curative notice regarding the Engine Defect, and to obtain the recovery of damages it has caused, the full repair of the Class Vehicles, and for reimbursement of all expenses associated with the repair of the Safety Defect or replacement of the Class Vehicles.

## II.    JURISDICTION

10. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §§1332(d)(2) and (6) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity

because Plaintiffs and defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because GM transacts substantial business in this district and is headquartered in this district. GM advertised in this district and received substantial revenue and profits from sales and/or leases of the Class Vehicles in this district. Therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

12.     This Court has personal jurisdiction over GM by virtue of its transactions and business conducted in this judicial district, and because GM is headquartered in the State of Michigan.

### III.    PARTIES

#### A.    Plaintiffs

**Betty Sherman**

13.     Plaintiff Betty Sherman is, and at all relevant times was, a resident of Albany, Dougherty County, Georgia.

14.     In 2021, Betty Sherman purchase a model year 2019 GMC Sierra 1500 from Prince Automotive Group at 2701 Ledo Road in Albany, Georgia. At the time of purchase, the Class Vehicle had approximately 13,000 miles on the odometer. Prince Automotive Group is part of GM's network of authorized dealers.

15.     Based on GM's advertising and marketing exclaiming the quality of its vehicles and its commitment to reliability, Betty Sherman purchased the Class Vehicle believing that the vehicle was safe, reliable, and of the highest quality.

16.     At no point before the purchase of the Class Vehicle did GM disclose to Betty Sherman that the Class Vehicle suffered from the Engine Defect, which results in catastrophic engine failure and places drivers and passengers at risk of physical injury.

17.     Having purchased a vehicle that is of a lesser standard, grade, and quality than represented, and that did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and reliable operation, Plaintiff Betty Sherman did not receive the benefit of her bargain. The Safety Defect has significantly diminished the value of the Class Vehicle.

18.     The Class Vehicle purchased by Betty Sherman included GM's manufacturer warranty, and the Class Vehicle has been maintained in accordance with GM's guidance.

19.     Although the Safety Defect is material, Plaintiff Betty Sherman would still purchase a different GM vehicle in the future as long as GM's representations about that vehicle, including its quality, safety, and durability, were accurate.

20.     Plaintiff Betty Sherman would not have funded the purchase of the Class Vehicle, or would have paid less for it, had she known about the Engine Defect.

**Anthony Lofton**

21.     Plaintiff Anthony Lofton is, and at all relevant times was, a resident of Albany, Dougherty County, Georgia.

22.     In 2021, Plaintiff Anthony Lofton funded Betty Sherman's purchase a model year 2019 GMC Sierra 1500 from Prince Automotive Group at 2701 Ledo Road in Albany, Georgia. At the time of purchase, the Class Vehicle had approximately 13,000 miles on the odometer. Prince Automotive Group is part of GM's network of authorized dealers.

23.     Since the purchase of the Class Vehicle, Anthony Lofton has been the primary user of the Class Vehicle and has been responsible for all payments on the outstanding loan for the Class Vehicle.

24.     Based on GM's advertising and marketing exclaiming the quality of its vehicles and its commitment to reliability, Anthony Lofton funded Betty Sherman's purchase of the Class Vehicle believing that the vehicle was safe, reliable, and of the highest quality.

25.     At no point before the purchase of the Class Vehicle did GM disclose to Anthony Lofton that the Class Vehicle suffered from the Engine Defect, which results in catastrophic engine failure and places drivers and passengers at risk of physical injury.

26.    Having funded the purchase of a vehicle that is of a lesser standard, grade, and quality than represented, and that did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and reliable operation, Plaintiff Anthony Lofton did not receive the benefit of his bargain.  The Safety Defect has significantly diminished the value of the Class Vehicle.

27.    The Class Vehicle purchased by Betty Sherman and paid for by Anthony Lofton included GM's manufacturer warranty, and the Class Vehicle has been maintained in accordance with GM's guidance.

28.    Although the Safety Defect is material, Plaintiff Anthony Lofton would still purchase a different GM vehicle in the future as long as GM's representations about that vehicle, including its quality, safety, and durability, were accurate.

29.    For several months prior to May 2025, Plaintiff Lofton noticed that when cold starting the Class Vehicle, he would hear ticking or knocking noises until the vehicle's engine warmed up. In addition, during that same period, Plaintiff Lofton occasionally felt and/or heard the engine misfire as he accelerated from a stop and, while at a full stop, would occasionally feel and/or hear the engine idle roughly.

30.    During the first week of May 2025, as Plaintiff Lofton was driving the Class Vehicle and preparing to stop at a stop sign, the vehicle's engine died and

would not restart. Thereafter, Plaintiff Lofton asked a friend with an OBD2 scanner to scan the vehicle for diagnostic codes. The scan of the vehicle showed a P0016 code reading. Upon reviewing information for the Class Vehicle on the NHTSA website, Plaintiff Lofton discovered that 2021-2024 model year GMC Sierra 1500s with the L87 engine were subject to NHTSA Recall N252494001.

31.    Plaintiff Lofton contacted GM regarding the Class Vehicle's engine failure and he was instructed to take the vehicle to Griffin Chevrolet of Sylvester, located at 1006 W. Franklin Street in Sylvester, Georgia. Griffin Chevrolet is part of GM's network of authorized dealers. The Class Vehicle has remained at Griffin Chevrolet GMC since early May, 2025.

32.    Plaintiff Lofton has been damaged as a result of the loss of use of the Class Vehicle, on which he is still making loan payments. In addition, Plaintiff Lofton has been forced to rent a vehicle on multiple instances because he has been deprived of use of the Class Vehicle. Anthony Lofton would not have funded the purchase of the Class Vehicle, or would have paid less for it, had he known about the Engine Defect.

**B.    Defendant**

33.    Defendant General Motors LLC, is a limited liability company organized and exhibiting under the law of the state of Delaware corporation, with its headquarters and principal place of business located at 300 Renaissance Center,

Detroit, Michigan, 48265. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.

34.    General Motors LLC designs, manufactures, markets, distributes, sells and brands, including Cadillac, Buick, GMC, and Chevrolet.  GM owns and controls the Chevrolet, Cadillac, Buick, and GMC brand websites.

35.    GM and/or its agents, designed, manufactured, and installed the L87 Engines in the Class Vehicles, and developed and disseminated the owner's manuals and warranty booklets, advertisements, and promotional materials relating to the Class Vehicles.  Additionally, GM designed the advertising material its GM dealerships distributed to consumers, regarding the Class Vehicles, authorized dealers to communicate with consumers about the performance of said vehicles, and established each dealerships as a place where material facts, information and representations were given or disclosed to prospective buyers.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

36.    Founded in 1908, GM has become one of the largest and most automobile manufacturers in the United States, selling its vehicles under several brands: Chevrolet, GMC, Cadillac, and Buick.  As of 2024, GM holds approximately 16.5% of the U.S. auto market, selling, servicing and marketing its network of over

4,000 authorized dealerships.  GM has sold many hundreds of thousands of Class

Vehicles across America.

37.    GM's marketing and promotion of the Class Vehicles proclaimed their

safety, reliability, quality, and performance, including their L87 Engines.

38.    For example, when the truck as reliable and durable, GM stated that the

L87 Engine "has the serious power you need for big jobs or big fun."  As for

"Safety," GM tells driver to "[g]o forth with added confidence."

39.    The "performance" of its L87 Engine was prominently featured in

GM's marketing of the Class Vehicles.

40.    And consumers were given comfort that, as Defendant represented,

"We care about your safety – big time."

41.    Despite its promises regarding the performance and safety of the Class

Vehicles, GM failed to adequately or timely warn consumers of the Engine Defect,

thereby rendering its statements false and/or misleading.

**B.    Durable Engine Bearings Are Necessary for the Safe and Dependable Operation of the Class Vehicles**

42.    Durable engine bearings are critically necessary components for the

proper **safe and dependable** functioning of an internal combustion engine such as

the L87 Engine.  These bearings, which are comprised of metallic sleeves around the

rotating components of the engine, hold the engine's rotating connecting rods in

place on top of a thin layer of oil, creating a protective buffer between the crankshaft

and the connecting rod, thereby reducing unwarranted metal-on-metal friction. Absent such engine bearings, the internal parts of an engine would wear down quickly due to heat and friction, leading to catastrophic engine failure.

43.    At bottom, when working properly, engine bearings maintain proper oil film clearance for lubrication, absorb and distribute mechanical loads, and prevent metal-to-metal contact under high-speed, high-load conditions. If engine bearings fail (due to oil starvation, debris, or wear), the engine can seize or suffer major internal damage.

**C.    Many Hundreds of Thousands of Class Vehicles Have Dangerous and Defective L87 Engines**

44.    The L87 is a 6.2-liter, eight-cylinder engine introduced in 2018 by GM that is found in a range of GM pickup trucks and SUVs.  The L87 Engine installed in the Class Vehicle contains a defect posing a dangerous safety risk to its owners and others.  The defect of the L87 Engines arises due to a bearing failure.

45.    According to GM, the L87 Engine is an advancement in engine technology.  GM has stated that:  "The L87 builds upon the previous 6.2L L86 with integral components for Automatic Start/Stop capability and available Dynamic Fuel Management (DFM) for even greater efficiency. Efficient, robust technologies including Direction Injection, Variable Valve Timing, oil-jet piston cooling, and a two-stage oil pump continue to be standard on L87."

11

46.     Originally incorporated into Chevrolet vehicles, the L87 Engine was subsequently installed in many GM's full-size trucks and SUVs, including the Chevrolet Silverado, GMC Sierra, Chevrolet Tahoe, Chevrolet Suburban, and GMC Yukon.

47.     It was not until April 2025, in connection with the 2025 Recall, when GM disclosed that the L87 Engine installed in the Class Vehicles suffers from the Safety Defect, acknowledging that "[t]he connecting rod and/or crankshaft engine components in these vehicles may have manufacturing defects that can lead to engine damage and engine failure."  According to GM's disclosure, there are "two primary root causes, both of which are attributable to supplier manufacturing and quality issues: (1) rod-bearing damage from sediment on connecting rods and crankshaft-oil galleries; and (2) out of specification crankshaft dimensions and surface finish."  GM warned drivers that "[i]f the engine fails during vehicle operation, the vehicle will lose propulsion, increasing the risk of a crash."

**D.      GM Had Pre-Sale Knowledge that the L87 Engines Are Dangerous and Defective**

48.     GM knew or should have known of the Engine Defect presenting a safety risk to Class Vehicle owners and others.  GM's knowledge and/or ability to know upon reasonable due diligence arises, among other things, from its (1) pre-sale testing; (2) records of customer complaints; (3) repair records; (4) warranty and post-warranty claims and part sales; (5) GM's 2023 TechLink article concerning the L87

Engine; and (6) its history of defective engine components, including rod bearings, causing engine failures.

49.     Experienced in the design and manufacture of motor vehicles, GM Defendant routinely conducts pre-sale tests to verify that their parts are free from defects and align with their specifications.

50.     As part of the design and manufacturing process Plaintiffs are informed and believe that with respect to the L87 Engine, GM performed a series of pre-production rigorous testing; including techniques to ensure durability and safety prior to sale, and testing its vehicles in extreme weather conditions, rough terrains, and speeds up to 150 mile per hour.

51.     Consumers are comforted by GM's claims that its engine "undergoes a vigorous validation process that includes thousands of hours of real-world testing in some of the harshest environments" and that "[t]his 'tested-tough' process, coupled with our use of the latest technology and state-of-the-art powertrain testing facilities, results in an exceptional product you can rely on."

52.     Plaintiffs are also informed and believe that GM performed quality control with respect to the bearings.  One example supporting this belief is the representation by Chevrolet that "GM Genuine Parts Engine Connecting Rod Bearing Pairs are designed, engineered, and tested to rigorous standards, and are

backed by General Motors. GM Genuine Parts are the true OE parts installed during the production of or validated by General Motors for GM vehicles."

53.     Given its rigorous pre-sale testing of the relevant engine parts, GM knew and/or should have been aware of the Engine Defect.

54.     On March 24, 2023, GM caused to be published on its TechLink website an article entitled "V8 Engine Crankshaft Bearing Conditions" for 2019-2023 Silverado, Sierra; 2021-2023 Tahoe, Suburban, Yukon and Escalade models equipped with L87 Engines, which article was not distributed to Class Vehicle purchasers and drivers.

55.     Based on this article, GM had knowledge of or, at a minimum would have been aware of, the Engine Defect, affecting hundreds of thousands L87 Engines, prior to March 24, 2023.

56.     Beyond this, Plaintiffs are informed and believe that GM's customer relations departments received numerous scores of reports of the Defect in Class Vehicles.

57.     GM's warranty departments also review and analyze warranty data submitted by their dealerships and authorized technicians to identify defects in their vehicles.  Pursuant to GM's required protocol, when a repair is made under warranty (or warranty coverage is requested), service centers provide GM with documentation of the problem and the fix, describing the complaint, cause, and correction.  The

broken part is saved in case GM later determines to audit the dealership or otherwise verify the warranty repair. Service centers are meticulous about providing this detailed information about in-warranty repairs to GM because, if they fail to do so, Defendant will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

58. Upon information and belief, GM learned of, or should have known about, the Engine Defect due to numerous complaints concerning the L87 Engine, including stalling issues, and replacement L87 Engines ordered from Defendant. In addition, on information and belief, GM's engineering offices, safety offices, and safety investigators communicate among one another to discuss potential issues in GM vehicles sharing components and designs.

59. Defendant also regularly monitors the NHTSA databases as part of its ongoing obligation under the TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000), to identify potential defects in its vehicles. Among other employees, GM customer service departments are responsible for monitoring customer complaints posted to NHTSA's public database, as well as their respective websites, or third-party websites.

60. Numerous complaints were submitted to NHTSA that support the existence of the Engine Defect in Class Vehicles equipped with L87 Engines, and its

impact on consumers. Some examples of such complaints filed with NHTSA providing GM with notice of the Engine Defect in Class Vehicles include:

**E.    Consumer Complaints Reveal the Magnitude of the Engine Defect**.

39.    Below are just a few examples of the numerous complaints Class Vehicle owners and lessees have lodged with the National Highway Transportation Safety Administration ("NHTSA") regarding the Engine Defect:

• <u>2019 Chevrolet Silverado LD 1500</u>: "Engine failed and had to be replaced because of bearing failure." (NHTSA ID Number: 11636561, Date Complaint Filed: 1/17/2025, Consumer Location: Richmond, MI).

• <u>2020 Chevrolet Silverado 1500</u>: "Main bearing on crankshaft when out." (NHTSA ID: 11630527, Date Complaint Filed: 12/13/2024, Consumer Location: Frisco City, AL).

• <u>2021 Chevrolet Silverado 1500</u>: "The contact owns a 2021 Chevrolet Silverado 1500. The contact stated while driving 55 MPH, she heard abnormal knocking sounds coming from the engine. The contact veered to the side of the road inspected the vehicle but found no issues. The contact continued driving for a while before the failure recurred and the sound was much louder. The check engine warning light illuminated. The vehicle was towed to a local dealer to be diagnosed. The contact was informed that twords had gone through the engine block and the engine needed to be replaced. The vehicle was not repaired. The manufacturer was made aware of the failure. The failure mileage was approximately 6,000." (NHTSA ID Number: 11444064, Date Complaint Filed: 12/16/2021, Consumer Location: Kitty Hawk, NC).

• <u>2021 GMC Yukon XL</u>: "While traveling at highway speeds, the vehicle suddenly and without warning lost power. All gauges remained in the normal range. After pulling on to the shoulder of a highway and turning the vehicle off, the vehicle would not start. After being towed the dealership, the vehicle would not power up. Dealership checked DTCS and found code P0016 Crankshaft Position Sensor and Intake/Single Camshaft Position Sensor Correlation. Dealership

inspected wiring for chaffing and tested camshaft position sensor circuitry, and all found in normal condition. Dealership followed document ID: 5646662 diagnostic procedure inspecting camshaft position sensor and camshaft actuator solenoid valve for incorrect installation or damage. While inspecting, dealership found internal engine bearing material in oil indicating internal mechanical failure. Dealership removed engine oil pan and #1 and #2 connecting rods and found bearings spun causing catastrophic engine failure. Crankshaft main bearing cap #3 also found discolored from extreme heat. Dealership then followed bulletin #22-NA-074 for replacement of engine oil, cooler lines and engine oil cooler after connecting rod and main bearing damage The vehicle only had 17,067 miles." (NHTSA ID Number: 11477035, Date Complaint Filed: 8/1/2022, Consumer Location: Corpus Christi, TX).

• 2021 GMC Yukon: "Total engine failure due to bearing issues in the bottom half of the engine." (NHTSA ID Number: 11580224, Date Complaint Filed: 3/30/2024, Consumer Location: Unknown).

• 2021 GMC Sierra 1500: "The contact owns a 2021 GMC Sierra 1500. The contact stated that while driving at an undisclosed speed, the vehicle failed to accelerate as needed and made an abnormal sound. The contact assumed that the sound was coming from the transmission and the vehicle was taken to a dealer. The dealer diagnosed the vehicle and suggested that the failure might be a pulley or a rod bearing failure. The contact took the vehicle to another dealer who confirmed a rod bearing failure. The manufacturer was not made aware of the failure. The vehicle was not repaired. The failure mileage was approximately 46,000." (NHTSA ID Number: 11592274, Date Complaint Filed: 6/3/2024, Consumer Location: Schertz, TX).

• 2021 GMC Sierra 1500: "The contact's husband owns a 2021 GMC Sierra 1500. The contact stated that while her husband was driving 80 MPH, the vehicle stalled. Additionally, the "Shift to Neutral and Restart" message blinked. The vehicle was steered to the side of the road where the vehicle failed to restart. The vehicle was towed to an independent mechanic where the failure was not able to be replicated. The vehicle was then towed to the dealer where it was suspected that the crankshaft bearing had seized, putting pressure on the starter, causing a short. The contact was informed that the engine needed to be

taken apart for a proper diagnostic test. The vehicle was not repaired. The manufacturer was notified of the failure. The failure mileage was approximately 81,000." (NHTSA ID Number:11614009, Date Complaint Filed: 9/11/2024, Consumer Location: Carneys Point, NJ).

• <u>2021 GMC Yukon</u>: "I was driving 55 mph and the engine failed without any prior warning. I was partially blocking traffic while waiting for a tow truck. The car was taken to a repair facility and diagnosed. Spun rod bearings on cylinders 1 and 2 damaged the crankshaft. I purchased this car $49,000 45 days ago and have made one payment on a car that is not drivable and parts are not readily available. There is a GM service bulletin because this is a known issue but not a recall. The power train warranty is up by mileage not time. I contacted the dealership and GMC and they will not assist with repairs." (NHTSA ID Number: 11626737, Date Complaint Filed: 11/21/2024, Consumer Location: Howell, MI).

• <u>2021 GMC Yukon XL</u>: "Our 6.2L failed unexpectedly after regular maintenance. No warning, just the sound of knocking in the engine then loss of power and bad sounds from the engine. Stranded on side of road. GM wants to replace the entire engine without opening engine, claiming lower engine damage. Technicians say this is spun rod bearing problem that is very common. Dangerous and poor quality." (NHTSA ID Number: 11636676, Date Complaint Filed: 1/17/2025, Consumer Location: Oakton, VA).

• <u>2021 Chevrolet Silverado 1500</u>: "Engine stopped working while driving on major highway. Coasted to stop on shoulder. Truck was towed to nearest Chevy dealer, Parkway Chevy, Tomball, TX ([XXX]). Diagnosed bearings failed, camshaft froze and engine valve damaged. After rude treatment by service agent and service manager, towed truck to original dealer in Conroe, TX-- Buckalew Chev/Keating Chev (Nov. 25, 2024). They confirmed problem and truck has been sitting at their dealership since Nov. 25, 2024 waiting for re-mfgd engine. No timeline given for replacement. Bought another truck (Toyota Tundra -- [XXX]). INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)." (NHTSA ID Number: 11636710, Date Complaint Filed: 1/18/2025, Consumer Location: Spring, TX).

• <u>2021 GMC Yukon XL</u>: "We were driving on the interstate outside of Chattanooga TN when our car went into neutral while we were in the left hand lane next to a 18 wheeler. My husband was driving and we have our four children and dog in the car. We lost acceleration. My husband was successful in getting us off the highway and onto the shoulder. The car started again and we tried to make it to the next exit when it went into neutral again and lost power. This was on [XXX]. We had it towed to the nearest dealer, Integrity Motors. They called us and said that it threw a rod and that the engine was broken and the whole engine would need to be replaced. After replacing the engine (it took 2 months) we picked the car up only to have the engine light come on. I took it to AutoZone where they ran the codes and told me that the fuel injectors were bad and possibly the intake manifold gasket. I called Chattanooga and they told me that I should take it to the nearest GMC dealer. Parks GMC in Greenville inspected the car and we had to put in 8 fuel injectors. I have documentation of all of these issues. There was no warning light or any warning that our engine was about to shut down. We could have been in a serious wreck with the 18 wheeler with possible loss of life or injury. We have had significant financial loss. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)." (NHTSA ID Number: 11636704, Date Complaint Filed: 1/18/2025, Consumer Location: Unknown).

• <u>2021 GMC Yukon</u>: "In July of 2024 while coming back from vacation pulling our boat our 2021 Yukon Denali with 6.2L motor started making noise while traveling on the interstate. I started to get over to the shoulder as the car lost power. I finally got it over to the shoulder as traffic was heavy and it was pouring down rain. As soon as I got it to the side of the road the check engine light came on and the engine died. It would not turn over or restart. After about 3 hours along side the very busy highway in bad weather GM finally sent a tow truck to take it to the dealer. After a week in a half it was finally diagnosed with spun rod bearings and main crankshaft bearings. The car had just over 21,000 miles and had been serviced per the manufactures recommendations. It took over 7 weeks for the car to be repaired where they replaced the engine with a remanufactured engine. We did not get a loaner car since it happened in KY and we live in IN. Our family had to find our own way home and a way to get our boat home also. We then had to find our own way back to get the vehicle once it was repaired. GM did reimburse

us for a rental car at $44 a day only and they did not pay any taxes or fees only the rental rate. You cannot rent a similar sized vehicle for $44 dollars a day. We spent approx. $2K out of our own pocket for expenses related to this breakdown. The vehicle now has approx. 29,000 miles on it and we have not had any problems since we got it back." (NHTSA ID Number: 11636742, Date Complaint Filed: 1/18/2025, Consumer Location: Plainfield, IN).

• 2021 Chevrolet Silverado 1500: "I was driving 65mph down the freeway when the truck suddenly turned off and the dash told me to put in neutral and start again so I did just that. Made it about another mile and the truck completely turned off and wouldn't turn back on there was nowhere to pull over or get off the freeway in that time frame so I was stopped in the middle of the highway with my family in the truck. Luckily a guy in another truck was able to push me over to the shoulder with his vehicle where I sat and waited four hours for a tow to the dealership. Two days later they called me and told me it's spun a bearing and threw two rods and needed a new engine. I'm anal about servicing my vehicles they told me it just happens, but it was a brand new truck with only 35k miles. Ever since I got the new engine installed it's constantly squeaking and they can't seem to pin point the issues I feel like it's going to happen again and this next time I'll probably be out of warranty and it'll be out of pocket for me to fix." (NHTSA ID Number: 11636943, Date Complaint Filed: 1/19/2025, Consumer Location: Unknown).

• 2022 Chevrolet Silverado 1500 LTD: "In March of 2024 my 2022 Silverado with the 6.2L V8 suffered a catastrophic main crankshaft bearing failure resulting in the vehicle losing power on a local highway. I was able to coast the vehicle to the side of the road where it would not restart. GM replaced the engine under warranty. 8 months later (November of 2024) the same vehicle suffered a subsequent engine failure with similar symptoms but I haven't yet received the exact cause." (NHTSA ID Number: 11636827, Date Complaint Filed: 1/18/2025, Consumer Location: North Las Vegas, NV).

• 2022 GMC Sierra 1500 Limited: "The contact owns a 2022 GMC Sierra 1500. The contact stated that while driving at an undisclosed speed, he heard a knock sound coming from the engine compartment. No warning lights were illuminated. The vehicle was taken to the

20

dealer, and during an inspection, the engine seized, after which the dealer diagnosed a failure with the rod bearings. The vehicle was repaired. The manufacturer was notified of the failure but provided no assistance. The failure mileage was 31,000." (NHTSA ID Number: 11585235, Date Complaint Filed: 4/25/2024, Consumer Location: Conway, SC).

• 2022 GMC Sierra 1500 Limited: "Just got off the highway was at stop sign on exit ramp and it just died. No warnings no lights no indication that something was about to happen. No neutral so couldn't even push it out of the way of traffic. Had it towed to shop for diagnostic. Possible lifter problem. $600. Dealership towed it to their shop. Engine tear down, lifters replaced. Gmc to pay 30%, dealership paying $1000, me $1300. Dealership started truck and the crank bearing spun. Now needs new engine, which are on back order. Cost ??? How long before engine available??? This is a known problem by the dealerships, GM & repair shops. Had we still been on the highway when this occurred doing 75mph we could have been killed." (NHTSA ID Number: 11597240, Date Complaint Filed: 6/27/2024, Consumer Location: Afton, MI).

• 2022 Chevrolet Silverado 1500 LTD: "GM has issue with Part restriction on the bottom end of the motor and rocker bearings going bad. No recalls on this just TSB. With that being said the motor blew a rod through the block because of the part restriction on the bottom end of the motor. GM wont fix it because it just a TSB. GM states that this is an issue the customer needs to fix and to look out for these issues. Even though the bottom end of the restriction is a catastrophic failure when there motor fails. I was 20 MPH when the rod in the motor went through the block. Now I got a 50000 dollar paper weight I cant drive because GM refuses to fix there issue." (NHTSA ID Number: 11635919, Date Complaint Filed: 1/14/2025, Consumer Location: Springtown, TX).

• 2022 GMC Yukon XL: "Engine failed on highway in a different state, was able to drive home but barely made it. 2 newborns, 2 toddlers, and 2 adults were all in the vehicle at the time the engine started squealing. No warning signs. Dealer dropped oil filter and it was full of metal. Official diagnosis was main crank thrust bearing failure. Rebuilt engine was installed under powertrain warranty (37500 miles). GM did not put us in a comparable rental vehicle, so I had to pay out of pocket expenses outside of their rental allowance for a compact car. Dealer charged for

an oil change. Dealer changed the rebuilt engine warranty terms upon pickup from 3yr/100,000miles to 12mo/12,000 miles or the current terms of power train warranty, whichever was longer. GM is well aware of this issue and is keeping it quiet. Rebuilt engines are on back order for months because it's that common of a failure." (NHTSA ID Number: 11636613, Date Complaint Filed: 1/17/2025, Consumer Location: Crown Point, IN).

• 2022 GMC Sierra 1500: "My truck lost power while driving on the interstate.. had to restart while traffic moved around me.. truck eventually restarted and then again died while getting off exit ramp in traffic. Towed to Dealership and was diagnosed with a "blown" rod bearing. Full Engine replacement." (NHTSA ID Number: 11636878, Date Complaint Filed: 1/19/2025, Consumer Location: Clarkston, MI).

• 2022 Chevrolet Silverado 1500: "I experienced rod bearing failure in my L87 6.2L engine at 27k miles. Luckily it didn't seize up while driving, but they did fail as I was driving home. Decided to report this after reading that it is becoming a common problem, but not a recall issue yet. GM is going to replace the engine, but there is no time frame whatsoever. I've seen people complaining about not having their repairs done for months at a time. I'm currently on week number two & counting." (NHTSA ID Number: 11636888, Date Complaint Filed: 1/19/2025, Consumer Location: Auburn, IN).

• 2022 GMC Yukon XL: "At 45K miles my 2022 Yukon 6.2L suffered a total engine failure on [XXX] just South of Atlanta, GA in rush hour traffic. My vehicle was completely inoperable and shifted itself into neutral. I barely made it off the road without getting hit. GM had my vehicle over a month and stated it had crankshaft bearing failure. No engines are available on a nation wide back log with no estimate on availability so I'm forced to go another route out of pocket to repair my vehicle. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)." (NHTSA ID) Number: 11636933, Date Complaint Filed: 1/19/2025, Consumer Location: Jay, FL).

• 2022 Chevrolet Silverado 1500: "-Bearing Failure -My Safety was put at Risk due to the vehicle instantaneously Stalling in the middle of a 4 Lane interstate without any prior warnings. -The vehicle has been

diagnosed by 2 dealerships which both state that receiving a new engine is near to impossible due to this exact issue to be happening to a lot more of the same vehicles at the same time. So unfortunately they cannot confidently give me an ETA or anything in regards to my vehicle even being fixed. -Yes by 2 GM Mechanics-No Warnings at all, the major concern is that there were no warnings at all. As well as leaving me stranded in the middle of a busy Interstate." (NHTSA ID Number: 11636946, Date Complaint Filed: 1/19/2025, Consumer Location: Belmont, NC).

• <u>2022 Cadillac Escalade</u>: "Driving vehicle between 70-80 miles an hour on the freeway when the car switched into neutral and lost all engine power. No warning lamps or any indication of failure. I was able to steer vehicle to left side of freeway and it had to be towed. It was not a safe location as cars were flying by just feet from the dibbled vehicle. It never started again. Towed to local Cadillac and have been told the car experienced catastrophic engine failure." (NHTSA ID Number: 11636951, Date Complaint Filed: 1/19/2025, Consumer Location: Sanford, FL).

• <u>2022 Chevrolet Silverado 1500</u>: "The engine shutdown while I was driving on the highway. Vehicle accessory power was working but engine wouldn't start. Truck was towed to dealer for repair. Dealer is replacing motor." (NHTSA ID Number: 11636955, Date Complaint Filed: 1/19/2025, Consumer Location: Unknown).

• <u>2022 GMC Sierra 1500 LIMITED</u>: "bought vehicle in may 2022. had engine suddenly 'lock up' while driving on the highway to work in November 2022. towed and repaired at gym dealer through December 2022 for 'spun bearing'. had 'fuel sensor' replaced in 10/23 when it failed the day before our planned fall break, towing our camper… then mid-December 2023 had camshaft part replacement when it 'locked up' again. got it back for 9 days when it once again 'locked up' (not driving this time…) and had engine completely replaced. on the first two occasions i was traveling at highway speed when all of a sudden- i lost power to the engine. thankfully i was on the shoulder side not towing anything either time!" (NHTSA ID Number: 11637928, Date Complaint Filed: 1/23/2025, Consumer Location: Knoxville, TN).

• <u>2023 Chevrolet Tahoe</u>: "Car completely died. Engine spun a bearing at 10, 000 miles." (NHTSA ID Number: 11562182, Date Complaint Filed: 12/27/2023, Consumer Location: Pelham, NH).

• <u>2023 Chevrolet Silverado 1500</u>: "There were no symptoms prior to the engine failure. On January 14th, 2025 while driving 58 miles per hour heard a sound that sounded like a slap on the back window. After the slap sound I noticed the engine was not running as normal. There was also a sound coming from the engine like metal rattling around. A few minutes later the check engine light appeared in the instrument panel. Had the vehicle towed to the nearest GM dealership and was informed that the thrust bearing went out which may have caused damage to the crankshaft." (NHTSA ID Number: 11636439, Date Complaint Filed: 1/17/2025, Consumer Location: Monroe, MI).

• <u>2023 GMC Yukon</u>: "I've had the engine blown and replaced twice. The first time it failed in the middle of an intersection. We could not put it in neutral to move it. We had to call a tow truck. No check engine lights just a noise. The engine had failed bc the bearings couldn't get oil. The second time it blew I was driving down the interstate and same thing only a noise so I pulled over and the car died. Also had to call a tow truck. It was the same as the first time the engine had blew because of the bearings not getting any oil. So now I'm on my third engine in a 2023, hoping that it doesn't do it again." (NHTSA ID Number: 11636779, Date Complaint Filed: 1/18/2025, Consumer Location: Burns Flat, OK).

• <u>2023 GMC Yukon</u>: "While passing on a two-lane road at approximately 70 MPH, the vehicle stalled and acted as if the engine wasn't running. Pulled over to the side of the road and was able to restart the engine after shifting to park. Engine was harder to start than usual and cranked slowly. After restarting, the engine ran fine for the remainder of the trip, but would occasionally have difficulty cranking. After this incident, the engine developed a knock that would vary with engine RPM, and sounded like a defective connecting rod bearing. Pulled the dipstick and noticed metal shavings in the oil. Took the vehicle to local dealership who confirmed the engine was defective and would require replacement. Vehicle has been at the dealership since December 5th waiting for a backordered engine." (NHTSA ID Number:

11636784, Date Complaint Filed: 1/18/2025, Consumer Location: Rio Rancho, NM).

• 2023 Chevrolet Tahoe: "While sitting at an intersection of a busy 4 lane road the engine stopped without warning and could not be restarted. Due to a poor design by GM, the Tahoe has no ability to be put in neutral when the engine isn't running. We were stuck at a busy intersection an almost hit multiple times, until a tow truck could come since it cannot be put in neutral and pushed. Dealer inspected engine and found it had been burning oil. The car never gave any warning lights that it was low on oil or that there were any engine issues. They did an oil change and gave the car back. The car was running, but within less than 5 miles of driving it it started to shake and make horrible noises. At this point, I was driving on the interstate. I was able to limp the vehicle back to the dealer. It was diagnosed by a dealer with spun engine bearing. I was told they were very close to seizing up and I would've been stranded on the interstate with no shoulder. This could've caused a major issue as I was on a busy interstate and the vehicle would've locked up. There was no shoulder at this point due to construction. Through both of these issues the vehicle never gave any dashboard warning lights. There are two major design flaws. The engine has an issue with its bearings. Also, there needs to be a way to put the vehicle into neutral while the engine is not running. It is not safe to not be able to put these vehicles into neutral." (NHTSA ID Number: 11636750, Date Complaint Filed: 1/18/2025, Consumer Location: Unknown).

• 2023 Chevrolet Suburban 1500: "While driving my family home from our Christmas vacation on the Garden State Parkway (NJ) the engine shut off and would not restart. This happened on a stretch of the highway with no shoulder while traveling at 65mph. Thankfully we were able to coast far enough to a section of highway with a shoulder. This incident left my [XXX] , [XXX] , my wife and I and our dog stranded in the freezing cold 100 miles from home. After a stressful next few days the Chevrolet dealership diagnosed it as blown bearings in the motor. It has now been over three weeks and no word from GM when a new motor will be available. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)." (NHTSA ID Number: 11636860, Date Complaint Filed: 1/19/2025, Consumer Location: Basking Ridge, NJ).

• <u>2023 Chevrolet Tahoe</u>: "On [XXX] while driving on the highway near Wash DC engine stopped, went to neutral. Would not start again. OnStar towed vehicle to Koons Chevrolet GMC Tyson in Vienna VA. 703 448 7221. On Tuesday Jan 7th, Koons Service Dept. looked at vehicle and determined that it was a thrown bearing and needed a new engine. There are 28,712 miles on vehicle. You can inspect if desired. Our safety was extremely compromised. We were on a 5 lane highway in the left hand lane going 65. Engine quit and we had to coast to the far right lane in heavy traffic. We almost got hit several times on the maneuver and rear ended on the side of the road from oncoming vehicles while waiting for a tow. Dealer has work order to fix the vehicle. Vehicle was not inspected by the manufacturer that we know of, nor the police or insurance representatives. Only inspected by the dealership. The only symptom before the incident was a dull sound like a plastic bag being stuck in the grill for a few minutes before incident. The Service Department said the parts are on a "Galactic backorder" which means they do not know when they will come in. GM is extremely uncooperative in assisting us with this issue. They will not repurchase vehicle, will not put in writing why they wont repurchase it. Will not provide any compensation until the issue is resolved, which could be months. It is an extreme financial hardship for me to cover my rental car (taxes and insurance for the rental car are not covered) and continue to pay the car payment and the insurance on a car that is not available to me. My case number with GM is [XXX]. I need my loan paid off or a repurchase for the original value of my car so I can purchase another vehicle. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)." (NHTSA ID Number: 11636869, Date Complaint Filed: 1/19/2025, Consumer Location: North Syracuse, NY).

• <u>2023 GMC Yukon</u>: "Yukon with 6.2 V8 suffered crankshaft bearing failure. Vehicle had only 9800 miles on it. No warning. Vehicle shifted itself into neutral and engine shut off. Engine replaced under warranty." (NHTSA ID Number: 11636873, Date Complaint Filed: 1/19/2025, Consumer Location: Huntersville, NC).

• <u>2024 GMC Sierra 1500</u>: "Engine bearing failure, complete loss of power while driving and turning left into oncoming traffic. Bearing failure confirmed by GM Dealer, brass shavings in oil pan." (NHTSA

ID Number: 11636622, Date Complaint Filed: 1/17/2025, Consumer Location: Jackson, MI).

• 2024 Chevrolet Silverado 1500: "Vehicle spun a bearing in the lower part of the engine after 1147 miles of use." (NHTSA ID Number: 11636703, Date Complaint Filed: 1/18/2025, Consumer Location: Huntington, IN).

61.     The NHTSA complaints are viewable online and searchable by NHTSA ID Number at https://www.nhtsa.gov/recalls.

62.     Upon information and belief, to the extent the aforesaid consumers who submitted a complaint to NHTSA took their Class Vehicles to GM's dealers, those dealers reported the complaints to GM.

63.     Complaints of the Engine Defect also were voiced on third-party websites respecting the Class Vehicles.

64.     Rod bearing failures resulting in catastrophic engine failure is a well-known safety risk in the automotive industry, respecting which GM has extensive knowledge.

65.     Indeed, GM previously disclosed in 2013 that the 2013-2014 Chevrolet Malibu, 2014 Chevrolet Impala, 2014 Buick Regal, 2013-2014 Cadillac ATS, and 2014 Cadillac CTS vehicles had faulty connecting rod bearings causing engine failure after just a few thousand miles.

**F.      GM Fails Provide a Fix Despite Admitting the Engine Defect it Created**

66.    On April 24, 2025, GM announced that it was recalling certain 2021-2024 Cadillac Escalade and Escalade ESV, Chevrolet Silverado 1500, Suburban, and Tahoe, GMC Sierra 1500, Yukon, and Yukon XL vehicles equipped with a 6.2L V8 gas engine due to a defect that causes L87 engine damage and failure.  In its Recall Report, GM described the "Defect," "Safety Risk," and "Cause" stating:[2]

> Description of the Defect: General Motors has decided that a defect which relates to motor vehicle safety may exist in certain 2021 – 2024 model year Cadillac Escalade and Escalade ESV, Chevrolet Silverado 1500, Suburban, and Tahoe, and GMC Sierra 1500, Yukon, and Yukon XL vehicles equipped with the 6.2L V8 gas engine (RPO L87). The connecting rod and/or crankshaft engine components in these vehicles may have manufacturing defects that can lead to engine damage and engine failure.

> Description of the Safety Risk: If the engine fails during vehicle operation, the vehicle will lose propulsion, increasing the risk of a crash.

> Description of the Cause: Engine teardown analysis identified two primary root causes, both of which are attributable to supplier manufacturing and quality issues: (1) rod-bearing damage from sediment on connecting rods and crankshaft-oil galleries; and (2) out of specification crankshaft dimensions and surface finish.

67.    It was reported to NHTSA in connection with the Recall, that "GM's investigation identified 28,102 field complaints or incidents in the US potentially related to failure of the L87 engine due to crankshaft, connecting rod, or engine

---

[2]      https://static.nhtsa.gove/odi/rcl/2025/RCLRPPT-25V274-1598.PDF (last visited June 26, 2025).

bearing failure, of which 14,332 involved allegations of loss of propulsion. These field complaints were received between April 29, 2021, and February 3, 2025." GM further revealed that it "identified 12 potentially related alleged crashes and 12 potentially related alleged injuries in the U.S." and "42 potentially related fire allegations in the U.S."

68.     In and April 2025 Technical Service Bulletin ("TSB") issued to GM's authorized dealerships, it instructed them to inspect the vehicles for diagnostic trouble code ("DTC") P0016, which indicates misalignment between the camshaft and crankshaft.[3]

69.     Absent demonstration of this DTC, dealers are merely instituted by GM to replace the factory fill oil (0W-20) for a higher viscosity oil (0W-40), replace the oil cap with one that is marked to indicate the higher viscosity oil is now required, and replace the oil filters on those vehicles passing this inspection.  This remedy is both ineffective and insufficient.  Using higher viscosity oil does not remedy the Defect.

70.     Even where the inspected Class Vehicles present this DTC, GM's TSB does not provide a suitable remedy, consequently leaving Class Vehicle drivers at risk of a catastrophic incident.

---

[3]     https://static.nhtsa.gov/odi/rcl/2025/RCRIT-25V274-8641.pdf  (last visited June 26, 2025).

71.    On May 1, 2025, GM issued another TSB, which ostensibly addressed replacement engines.[4]  This too does not offer a true remedy because, among other reasons, replacing the defective L87 Engine with the same type of engine fails to remedy the Engine Defect, and merely leaves consumers at risk of the same safety risk of crashing.  Not surprisingly, consumers have reported that the replaced L87 Engines have experienced the same catastrophic failures as the ones initially installed in their Class Vehicles.

### G.    Fraudulent Omission/Concealment Allegations

72.    Plaintiffs' claims arise out of Defendant's fraudulent and material omission/concealment of the Engine Defect, amid its representations about the quality, reliability, and safety of the Class Vehicles.

73.    Plaintiffs allege, upon information and belief, that at all relevant times, including specifically at the time they and Class Members purchased their Class Vehicles, Defendant (a) knew, or were reckless in not knowing, of the Engine Defect; (b) had a duty to disclose the Engine Defect based upon its exclusive knowledge; and (c) never disclosed the Engine Defect to Plaintiffs or the public at any time or place in any manner prior to the aforementioned 2025 Recall.

---

[4]    https://static.nhtsa.gov/odi/rcl/2025/RCRIT-25V274-5347.pdf (last visited June 26, 2025).

74.   The following specific concealment/omission-based allegations are made with as much specificity as possible given Plaintiffs' lack of access to more specific information necessarily available only to or in the exclusive control of Defendant:

75.   **Who:** GM actively concealed and omitted the Defect from Plaintiffs and Class Members.  Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals responsible for such decisions.

76.   **What:** GM failed to timely or adequately disclose that the Class Vehicles contain the Engine Defect, as alleged herein, despite making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

77.   **When:** This material information was regarding the Engine Defect was concealed or omitted by Defendant at all times while making representations about the quality, safety, and dependability of the Class Vehicles on an ongoing basis, and continuing.  GM further denied an adequate repair for the Engine Defect and warranty coverage despite the fact that consumers brought their vehicles to GM dealerships or called Defendant's respective customer service and warranty departments complaining of the Defect.

78.   **Where:** Prior to the 2025 Recall, GM concealed and omitted material information regarding the true nature of the Defect in every communication they had

with Plaintiffs and Class Members, and made representations about the quality, reliability, and safety of the Class Vehicles.

79.    **How:** GM concealed and omitted the Engine Defect from Plaintiffs and Class Members when making representations about the quality, safety, and dependability of the Class Vehicles, and actively concealed and omitted the truth about the existence, scope, and nature of the Engine Defect at all times, even though it knew about said defect and knew that information about it that was important to a reasonable consumer.  Defendant's had marketing materials promised that the Class Vehicles have qualities they do not have.

80.    **Why:** GM actively concealed and omitted material information regarding the true quality, safety, and durability of the Class Vehicles and the Engine Defect induce Plaintiffs and Class Members to purchase and/or lease GM's Class Vehicles.  Had the truth been disclosed, Plaintiffs and Class Members would not have bought or leased the Class Vehicles, or would not have paid as much for them.

## V.    TOLLING OF STATUTES OF LIMITATIONS

81.    Any applicable statute(s) of limitations have been tolled by GM's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and the members of the Class could not have reasonably discovered the true nature of the Engine Defect because Defendant concealed it.  Plaintiffs' claims were thus tolled pursuant to the discovery rule, for fraudulent concealment, and for estoppel.

A.     **Discovery Rule**

82.    The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles contained the Engine Defect.

83.    As alleged above, Class Members had no way of knowing about the Engine Defect in their Class Vehicles. GM concealed its knowledge of the Defect while GM continued to market and sell the Class Vehicles as safe, secure, high-quality, and reliable vehicles.

84.    Within any applicable statutes of limitation, Class Members could not have discovered through the exercise of reasonable diligence that GM was concealing the conduct complained of herein and misrepresenting the true qualities of the Class Vehicles.

85.    Class Members did not know facts that would have caused a reasonable person to suspect that there was an Engine Defect affecting their vehicle and an ordinary person would be unable to appreciate that the vehicle was defective. Indeed, even after Class Members contacted GM and its authorized dealers for vehicle repairs concerning the Engine Defect, they were routinely told by Defendant and/or through its dealers that the Class Vehicles were not defective and/or they were offered a "remedy" that fails to address the Engine Defect. As described above, the true cause of the engine failures in the Class Vehicles is a defect caused by the

defective design and/or manufacturing of L87 Engines and the purported remedies do not address the actual causes of the Engine Defect.

86.     No full, complete, and adequate disclosure of the Engine Defect has come to light, despite the April, 2025 Recall, nor was any made any sooner than the April 2025 Recall, at the earliest.

87.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims in this litigation.

**B.     Fraudulent Concealment**

88.     As the manufacturer, distributor, seller, and/or warrantor of the Class Vehicles, GM was under a continuous duty to disclose to Class Members the existence of the Defect found in the Class Vehicles.

89.     Defendant was and remains under a continuing duty to disclose to Plaintiffs and the Members of the Class the true character, quality, and nature of the Class Vehicles, that the Defect found in the Class Vehicles will result in catastrophic engine failure, among other safety risks, that they will require costly repairs, pose safety concerns, cause damage to their personal property, and diminish the resale value of the Class Vehicles.

90.     GM recklessly disregarded the true nature, quality, and character of the Class Vehicles, by failing to disclose the existence of the Defect.

91.     Due to Defendant's concealment throughout the time period relevant to this action, all applicable statutes of limitation have been tolled.

92.     Instead of publicly disclosing the Defect in the Class Vehicles, Defendant kept owners and lessees in the dark about the Defect present in their vehicles.

93.     Class Members were not at fault for failing to discover the existence of the Defect present in their Class Vehicles.

94.     Until he experienced catastrophic engine failure while on the road and the 2025 Recall was issued, Plaintiffs had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice of such a connection. In particular, Class Members did not possess the aggregate data concerning L87 Engine failures or the technical data related to the design and manufacturing of the Class Vehicles.

95.     This ignorance of the existence of the Defect present in the Class Vehicles is common across each Plaintiff and Class Member.

**C.      Estoppel**

96.     GM was, and is, under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles. GM failed to disclose the existence of the Defect and actively concealed the true character, quality, and nature of the Class Vehicles while knowingly making representations about the quality and reliability of the Vehicles. Plaintiffs and Class

Members reasonably relied upon GM's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

## VI.    CLASS ALLEGATIONS

97.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

98.    Plaintiffs seek to represent a class ("Nationwide Class" or "Class") defined as:

> All persons or entities that purchased or leased a Class Vehicle in the United States.

99.    Excluded from the Class are Defendant, its affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class definitions based on discovery and further investigation.

100.    _Numerosity_: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that at least eight hundred thousand Class Vehicles have been sold and leased in the United States.

101.   Existence and Predominance of Common Questions of Fact and Law:

Common questions of law and fact exist as to all members of the Class. These

questions predominate over the questions affecting individual Class Members.

These common legal and factual questions include, but are not limited to:

a.   Whether Defendant engaged in the conduct alleged herein;

b.   Whether Defendant designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

c.   Whether the Class Vehicles were sold with a safety defect;

d.   Whether Defendant knew of the Defect but failed to disclose the problem and its consequences to its customers;

e.   Whether a reasonable consumer would consider the Defect or its consequences to be material;

f.   Whether Defendant breached implied warranties with respect to the Defect;

g.   When Defendant discovered the Defect in the Class Vehicles, and what, if anything, it did in response;

h.   Whether Defendant should be required to disclose the existence of the Defect;

i.   Whether Defendant's conduct violates the consumer protection statutes asserted herein;

j.   Whether Plaintiffs and Class Members overpaid for their Class Vehicles; and

k.   Whether Plaintiffs and Class Members experienced out-of-pocket losses as a result of the Defect, and if so, how much.

102. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class because Plaintiffs purchased a Class Vehicle with the same Engine Defect as did each member of the Class. Furthermore, Plaintiffs and all Members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members.

103. <u>Adequacy</u>: Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class that they seeks to represent, they have retained counsel competent and highly experienced in complex class action litigation, and they intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

104. <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and Members of the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for Members of the Class individually to redress effectively the wrongs done to them. Even if the Members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential

for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendant's vehicle identification numbers, warranty claims, registration records, and database of complaints.

105.    Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## VII.    CAUSES OF ACTION

### COUNT I: VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq*.)
### (On Behalf of the Nationwide Class)

106.    Plaintiffs incorporate by reference every allegation set forth in preceding paragraphs as if fully stated herein.

107.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

108.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

109.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

110.   GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

111.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

112.   GM provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of its vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, GM warranted that the Class Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

113.   GM breached its implied warranties, as described herein, and is therefore liable to Plaintiffs under 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles all suffer from the common Engine Defect, which creates an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Class Vehicles. The Engine Defect rendered the Class Vehicles

unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

114. As discussed herein, on information and belief, GM knew or should have known about the Engine Defect prior to sale based upon, among other facts: (1) Defendant's pre-sale testing; (2) Defendant's own records of customer complaints; (3) dealership repair records; (4) warranty and post-warranty claims and part sales; (5) GM's 2023 TechLink article concerning the L87 Engine; and (6) GM's history of defective engine components, including rod bearings, causing engine failures.

115. GM omitted information about the Engine Defect and its consequences from Plaintiffs and Class members, misrepresented the qualities of the Class Vehicles, and has failed to provide a fix for the Defect.

116. Any effort by GM to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

117. Any limitations GM might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between GM and Plaintiffs, because, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from GM.

118.   Any limitations GM might seek to impose on its warranties are substantively unconscionable. GM knew or should have known that the Class Vehicles were defective and that the Class Vehicles suffered from a safety defect and placed drivers at risk when used as intended long before Plaintiffs and Class members knew or should have known. GM failed to disclose this defect to Plaintiffs and Class members. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

119.   Plaintiffs and other Class members have had sufficient direct dealings with Defendant to establish privity of contract between Defendant on one hand, and Plaintiffs and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendant and their dealers, and specifically, of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Defendant was also aware that the ultimate consumers of the Class Vehicles (i.e., the Class) required vehicles that would function safely, could be relied upon, and otherwise meet minimum industry standards. Additionally, privity is excused here because Plaintiffs and each of the other Class members relied on statements made by Defendant itself

in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform, and was controlled and disseminated directly by Defendant.

120.   Under 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and is not required to give GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs under Rule 23 of the Federal Rules of Civil Procedure.

121.   Plaintiffs would suffer economic hardship if they returned their Class Vehicle but did not receive the return of all payments made by them. Because GM will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted the Class Vehicle by retaining it.

122.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by

Plaintiffs and Nationwide Class members in connection with the commencement and prosecution of this action.

123.   Plaintiffs also seek the establishment of a GM-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Engine Defect in their Class Vehicles.

## COUNT II: UNJUST ENRICHMENT
### (On Behalf of the Nationwide Class)

124.   Plaintiffs incorporate by reference every allegation set forth in preceding paragraphs as if fully stated herein.

125.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3).

126.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of unjust enrichment, which is materially uniform or substantially similar in all states.

127.   Defendant designed, manufactured, produced, distributed, marketed, and/or sold the Class Vehicles during the relevant period herein.

128.   Plaintiffs and members of the Class conferred non-gratuitous benefits upon Defendant, without knowledge that the Class Vehicles contained the Engine Defect.

129.   Defendant appreciated, or had knowledge of, the non-gratuitous benefits conferred upon them by Plaintiffs and members of the Class.

130.   Defendant accepted or retained the non-gratuitous benefits conferred by Plaintiffs and members of the Class, with full knowledge and awareness that, as a result of Defendant's unconscionable wrongdoing, Plaintiffs and members of the Class were not receiving products of high quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

131.   Retaining the non-gratuitous benefits conferred upon Defendant by Plaintiffs and members of the Class under these circumstances made Defendant's retention of the non-gratuitous benefits unjust and inequitable.

132.   Because Defendant's retention of the non-gratuitous benefits conferred by Plaintiffs and members of the Class is unjust and inequitable, Plaintiffs and members of the Classes are entitled to, and hereby seek, disgorgement and restitution of Defendant's wrongful profits, revenue, and benefits in a manner established by the Court.

## COUNT III: FRAUDULENT CONCEALMENT
### (On Behalf of the Nationwide Class)

133.   Plaintiffs incorporate by reference every allegation set forth in preceding paragraphs as if fully stated herein.

134.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of fraudulent concealment, which is materially uniform or substantially similar in all states.

135.   GM fraudulently concealed and suppressed material facts concerning the quality of the Class Vehicles and the existence of the Defect.

136.   Despite advertising the Class Vehicles as safe, reliable, and being of high quality, GM knew when it manufactured, marketed, and sold or leased the Class Vehicles that the Class Vehicles suffered from a design and/or manufacturing defect that reduced the Class Vehicles' value and subjected the Class Vehicles to the risk of stalling while driving and that rendered the Class Vehicles unreliable and posed significant safety hazards to drivers.

137.   GM failed to disclose these facts to consumers at the time it manufactured, marketed, and sold or leased the Class Vehicles, and GM knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profits.

138.   Through its active concealment and/or suppression of these material facts, GM sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Vehicles were of sound quality and that GM was a reputable manufacturer that stands behind the automobiles it manufactures. GM engaged in this behavior to protect its profits,

avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

139.   Plaintiffs and Class members were unaware, and could not reasonably discover on their own, that GM's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

140.   GM had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Defect because:

(a) GM had exclusive or far superior knowledge of the Defect and concealment thereof;

(b) the facts regarding the Defect and concealment thereof were known and/or accessible only to GM;

(c) GM knew that Plaintiffs and Class members did not know about, or could not reasonably discover, the Defect and concealment thereof; and

(d) GM made representations and assurances about the qualities of the Class Vehicles, and about the existence of a repair for the Defect that were misleading, deceptive, and incomplete without the disclosure of the fact that the Class Vehicles suffered from a latent and inherent design and/or manufacturing defect.

141.   These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase or lease the Class Vehicles, and because they substantially reduced the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Whether the Class Vehicles were defective, of sound quality, safe, reliable, and whether GM stood behind such Vehicles would

have been an important factor in Plaintiffs' and the Class members' decisions to purchase or lease the Vehicles. Plaintiffs and Class members trusted GM not to sell them vehicles that were defective and significantly overpriced.

142.   GM intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were free from known defects, as represented by GM and reasonably expected by consumers.

143.   Plaintiffs and Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased/leased them at all, if they had known of the concealed and suppressed facts. Plaintiffs and Class members did not receive the benefit of their bargain due to GM's fraudulent concealment. Plaintiffs' and Class members' actions in purchasing the Class Vehicles were justified. GM was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or Class members.

144.   Plaintiffs and Class members relied to their detriment upon GM's reputation, fraudulent misrepresentations, and material omissions regarding the quality, safety, and reliability of the Class Vehicles.

145.   As a direct and proximate result of GM's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and Class members suffered injury. They purchased and leased Class Vehicles that had a

diminished value by reason of GM's concealment of, and failure to disclose, the Defect.

146.   Accordingly, GM is liable to the Nationwide Class for their damages in an amount to be proven at trial.

147.   On information and belief, GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and Class members. GM also continues to conceal material information regarding the Defect.

148.   GM's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV: STRICT PRODUCT LIABILITY
### (On Behalf of the Nationwide Class)

149.   Plaintiffs incorporate by reference every allegation set forth in preceding paragraphs as if fully stated herein.

150.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of fraudulent concealment, which is materially uniform or substantially similar in all states.

151.   By placing an unreasonably dangerous product in the stream of commerce, Defendant is strictly liable.

152.    Defendant is strictly liable for designing, engineering, testing, validating, manufacturing, marketing, and placing in the stream of commerce the Class Vehicles which are unreasonably dangerous and defective due to the Engine Defect.

153.    Defendant designed, engineered, tested, validated, manufactured, marketed, and placed in the stream of commerce the Class Vehicles which are unreasonably dangerous and defective due to the Engine Defect.

154.    The Class Vehicles and L87 Engines installed therein are being used in an intended and/or foreseeable manner. Plaintiffs and Class Members have not misused or materially altered the Class Vehicles or the L87 Engines. The Class Vehicles and L87 Engines are in the same or substantially similar condition as they were at the time of purchase or lease.

155.    The Class Vehicles and L87 Engines are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Defect that can cause Class Vehicles to suddenly and unexpectedly experience catastrophic engine failure.

156.    The Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiffs, Class Members, and others on the road at an unreasonable and substantial risk for injury or death.

157. Defendant was aware of feasible alternative designs which would minimize or eliminate the Defect and the risk it poses. Such alternative designs were known and available when the Class Vehicles and L87 Engines were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

158. Defendant failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and L87 Engines that are free from the Defect and the unreasonable safety risks it poses.

159. The Defect causes damage to property other than the L87 Engine itself, including damage to other components of the Class Vehicles as a result of engine failures and other property located within the vehicles.

160. As a direct and proximate result of Defendant's actions as described herein, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial.

## COUNT V: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On Behalf of the Nationwide Class)

161. Plaintiffs incorporate by reference every allegation set forth in preceding paragraphs as if fully stated herein.

162. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class for breach of implied warranty pursuant to U.C.C. § 2-314.

163.   Defendant is a "merchant," a "seller," and "lessor" of motor vehicles under the U.C.C.

164.   Defendant was, at all relevant times, the manufacturer, distributor, warrantor, seller and/or lessor of the Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

165.   GM impliedly warranted that the Class Vehicles and any parts thereof are of merchantable quality and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles are safe and reliable for providing transportation and would not result in the premature wear and eventual failure of its engine. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, inter alia, the Class Vehicles suffered from the Engine Defect at the time of sale that creates the undue risk of engine failure and stalling while driving. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

166.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and other Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from a defective design(s) and/or manufacturing defect(s).

167.    Defendant had actual knowledge of the Engine Defect, and wrongfully and fraudulently concealed these material facts from Plaintiffs and the Class. Defendant was provided notice of these issues through, inter alia, warranty claims, its defect investigations, complaints posted on the internet, customer lawsuits, and complaints lodged by consumers with NHTSA – which Defendant routinely monitors – before or within a reasonable amount of time after the allegations of the Defect became public. Plaintiff Lofton notified GM of the Engine Defect in May 2025, after his engine failed. Plaintiff Lofton, individually and on behalf of the Class, also notified GM of the Engine Defect and the breach of warranty alleged herein through a notice letter, dated July 7, 2025.

168.    GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

169.    Plaintiffs and other Class members have had sufficient direct dealings with Defendant to establish privity of contract between Defendant on one hand, and Plaintiffs and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendant and their dealers, and specifically, of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements

Case 2:25-cv-12032-BRM-APP    ECF No. 1, PageID.55    Filed 07/07/25    Page 55 of 58

were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiffs and each of the other Class members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform, and was controlled and disseminated directly by Defendant.

170.    Plaintiffs, on behalf of themselves and the Class, seek monetary damages, treble damages, costs, attorneys' fees, and such other and further relief provided by law and equity.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that this Court:

a.    Certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' counsel as Class Counsel;

b.    Declare that any applicable statutes of limitations are tolled due to Defendant's fraudulent concealment and that Defendant is estopped from relying on any statutes of limitations in defense;

c.    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair and/or

recall the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of the Defect;

d.    Award Plaintiffs and Class Members actual, compensatory, general, special, incidental, statutory, punitive, and consequential damages, costs, and disgorgement in an amount to be determined at trial;

e.    Award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

f.    Award pre- and post-judgment interest at the maximum legal rate;

g.    Grant leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

h.    Grant all such other relief as is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

Dated: July 7, 2025

*/s/ Dennis A. Lienhardt*
E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
Dana E. Fraser (P82873)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307

Telephone: (248) 841-2200
epm@millerlawpc.com
dal@millerlawpc.com
def@millerlawpc.com

Stephen R. Basser (SBN 121590)
Samuel M. Ward (SBN 216562)
**BARRACK, RODOS & BACINE**
One America Plaza
600 West Broadway, Suite 900
San Diego, CA  92101
(619) 230-0800
sbasser@barrack.com
sward@barrack.com

*Attorneys for Plaintiffs Betty Sherman*
*and Anthony Lofton*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 7, 2025, I electronically filed the foregoing document(s) using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*<u>/s/ Dennis A. Lienhardt</u>*
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
dal@millerlawpc.com
